IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KIMBERLY RUSSELL,

        Plaintiff,

    v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

Civil No. 6:12-cv-01939-SI

OPINION AND ORDER

        KATHRYN TASSINARI
        BRENT WELLS
        Harder, Wells, Baron & Manning, P.C.
        474 Willamette, Suite 200
        Eugene, OR  97401

           Attorneys for Plaintiff

        S. AMANDA MARSHALL
        United States Attorney
        ADRIAN L. BROWN
        Assistant United States Attorney
        1000 SW Third Avenue, Suite 600
        Portland, OR  97201

HEATHER L. GRIFFITH
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA  98104

Attorneys for Defendant

SIMON, Judge.

Ms. Kimberly Dawn Russell seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI"). For the following reasons, the Commissioner's decision is REVERSED and REMANDED for an award of benefits.

## BACKGROUND

### I.   The Application

Ms. Russell filed a Title II application for DIB and SSI on August 26, 2008, alleging disability beginning on January 6, 2005. AR 157-166.  Ms. Russell alleges disability due to a combination of impairments, including a back injury, herniated discs, degenerative disc disease, chronic pain, depression, anxiety, bipolar disorder, and loss of use of her legs.  AR 157, 161, 177, 213.  The Commissioner denied Ms. Russell's application both initially and on reconsideration, and Ms. Russell then requested a hearing before an Administrative Law Judge ("ALJ").  AR 85-101, 105.  On January 26, 2011, ALJ Rudolph Murgo conducted a hearing.

AR 46.   The ALJ determined Ms. Russell was not disabled and on June 22, 2011, the ALJ issued a decision denying her claims for benefits.   AR 7-29.   On August 29, 2012, the Appeals Council denied Ms. Russell's request for review of the hearing decision. AR 1-4.   Ms. Russell now seeks judicial review of that decision.

## II.   Summary of Evidence

Born in 1977, Ms. Russell was 33 years old at the time of the hearing.   AR 52.   She did not graduate from high school, but obtained her GED and trained as a certified nurse's assistant ("CNA").   AR 54.   Ms. Russell's past work included jobs as a CNA and as a caregiver.   AR 56.

### A.   Relevant Medical Evidence

Ms. Russell began seeing Dr. John Ward in July 2004.   AR 500, 748.   At that time, and throughout the remainder of 2004, she complained of lower back pain with lifting and movement.   AR 495, 499-500.

On January 6, 2005, Ms. Russell was injured while working as a CNA when a client and his walker fell on her.   AR 269.   On January 7, 2005, Thomas Thrall, MD, examined Ms. Russell.   AR 269. Dr. Thrall noted Ms. Russell's past history of online low back pain for the previous year, which was not work related.   AR 269. Ms. Russell reported to Dr. Thrall that after the injury on January 6, 2005, she was having considerably more back pain, with

radiation into the midback.  AR 269.  Ms. Russell was seen by Dr. Thrall again on January 10, 2005, January 14, 2005, and February 4, 1005.  AR 269-71.  She was seen by Dr. Charles Pederson on January 18, 2005, and February 1, 2005.  AR 269-70.  Ms. Russell continued to complain of low back pain, with limited range of motion and mobility.  AR 269-70.

On February 10, 2005, an MRI revealed a disc protrusion at L4-5, with moderate central canal stenosis and mild right and severe left lateral recess encroachment, and compression of the L5 nerve root.  AR 271, 571.

On March 2, 2005, orthopedic surgeon Dr. Gregory Strum examined Ms. Russell for SAIF Corporation.  AR 268.  Dr. Strum diagnosed Ms. Russell with chronic persistent low back pain related to degenerative disc disease at L4-5, with a moderate-sized disc herniation not causing neural anatomic compromise.  AR 277.  Because of the pre-existing back condition, which was exacerbated by the January 6, 2005, injury, Dr. Strum recommended work in a light to medium duty job.  AR 280.

On March 10, 2005, Dr. Jaimy Patton administered an L4-5 transforaminal steroid injection.  AR 283.

On April 4, 2005, orthopedic surgeon Dr. Todd Lewis examined Ms. Russell.  AR 320.  Dr. Lewis noted a herniated L4-5 disc causing stenosis and root impingement.  AR 324.  He proposed a surgical excision of the disc.  AR 325.  Dr. Lewis placed Ms.

Russell on limited activities restriction, including restrictions on bending, lifting, carrying, twisting, extension, pushing, and pulling.  AR 325.

On April 25, 2005, orthopedic surgeon Dr. Edward Grossenbacher and neurosurgeon Dr. Thomas Dietrick examined Ms. Russell for SAIF Corporation.  AR 285.  The doctors noted Ms. Russell ambulated with a slow, guarded gait, antalgic on the left, and her range of motion was markedly limited.  AR 287-88. Sensation was decreased over L5.  AR 288.  They diagnosed a disc herniation at L4-5 with encroachment verified by MRI and chronic degenerative disc disease at L4-5.  AR 288-89.

The doctors stated that their diagnoses agreed with Dr. Lewis's but not with Dr. Strum's.  AR 289.  They stated Ms. Russell could work with intermittent sitting and standing, and no lifting greater than ten pounds.  AR 291.  They further stated her prognosis was guarded, because of her deconditioned state and weight, as well as the chronicity of her complaints. AR 291.  The doctors noted her reflexes were equal and there was no demonstrable weakness, and felt that instead of surgical intervention, an alternate form of treatment with continued observation and conservative care would also be a medical option. AR 292.

On June 9, 2005, Dr. Lewis performed an excision of the L4-5 disc.  AR 297.  He found a large subligamentous disc herniated and

removed it. AR 297. On June 24, 2005, Dr. Lewis performed a post-operative examination. AR 327. Ms. Russell reported her low back pain was gone, but she had left gluteal pain occasionally radiating into her calf, which worsened when walking and standing. AR 327. On July 8, 2005, Dr. Lewis examined Ms. Russell again and she reported significant persistent pain in her left leg. AR 329. Another MRI was performed on July 15, 2005, and on July 22, 2005, Dr. Lewis reported the MRI showed some inflamation, but no recurrent disc or infection. AR 330.

On September 26, 2005, orthopedic surgeon Dr. Anthony Woodward performed an independent medical examination of Ms. Russell. AR 305. Ms. Russell complained of constant pain in the lumbosacral area which radiated in the midline to the coccyx, into the medial aspect of the left buttock and posterior left thigh. AR 306. Dr. Woodward concurred with Dr. Strum, stating that he did not believe Ms. Russell sustained a disc herniation in her January 6, 2005, injury. AR 318. He disagreed with Drs. Grossenbacher and Dietrich as to causation. AR 318.

Throughout the remainder of 2005 and into 2006, Ms. Russell was seen by Dr. Ward, and reported continued back pain. AR 485, 481, 476, 474. On December 5, 2006, Ms. Russell reported increased low back pain going into the buttock and her left leg, as she had experienced with her herniated disc. AR 472. Dr. Ward noted some weakness on the left with plantar flexion. AR 472. On

6 – OPINION AND ORDER –

February 9, 2007, Ms. Russell reported an increased "pins and needles" sensation in the left foot, with pain after walking.  AR 469.

On March 22, 2007, Ms. Russell had new back pain with a persistent, severe ache and radiation into the left buttock.  AR 466.  On June 10, 2007, Ms. Russell was transported by ambulance to the hospital after falling down five stairs at her home.  AR 362.  The next day, Dr. Ward noted a CT scan was negative, but that there was pain to palpation over the midline, and decreased sensation over the left lower leg, decreased reflexes in the patellar and Achilles on the left leg.  AR 465.  Dr. Ward also noted the left leg pain was suggestive of left radiculopathy at L5-S1.  AR 465.

In November 2007, Ms. Russell reported continued left leg pain, worse at times with increased activity.  AR 460.  She also had some weakness in her left leg and numbness in the toes.  AR 460.  Dr. Ward noted a continuation of the decreased sensation over the left lower leg and decreased patellar and Achilles reflex on the left leg.  AR 460.  A new MRI showed post-surgical changes at L4-5 with a small central protrusion and retrolisthesis, but no surgical lesion.  AR 461.

In January 2008, Ms. Russell reported increased weakness in the left leg.  AR 458.  In March 2008, Ms. Russell had a second transforaminal injection, which did not seem to help.  AR 375,

455.  In May 2008, Ms. Russell reported pain medications overall seemed to be fairly effective in controlling her persistent low back pain.  AR 453.

On November 22, 2008, Dr. Ryan Vancura examined Ms. Russell at the request of the agency.  AR 383.  Dr. Vancura reviewed Ms. Russell's medical records and performed a 30-minute examination. AR 383.  Dr. Vancura noted Ms. Russell was easily able to transfer from the chair to the examination table, and sit comfortably, with mildly increased efforts.  AR 384.  There was no evidence of poor effort or inconsistencies.  AR 384.  Sensory examination was diminished in a L5 distribution on the left lower extremity.  AR 386.  Dr. Vancura diagnosed failed back syndrome with left L5, lumbar radiculopathy and likely post-surgical and post-traumatic degenerative disc disease and facet joint arthropathy.  AR 387. He opined that her maximum standing and walking capacity was up to four hours, and no limitations in sitting.  AR 387.  She could lift and carry 20 pounds occasionally and 10 pounds frequently, could occasionally stoop, bend, kneel, and crouch, and should never climb, balance, or crawl.  AR 387.

In January 2009, Ms. Russell reported persistent ongoing low back and leg pain, with pain worse at night and if she remained in one position for too long.  AR 440.  In February 2009, Ms. Russell reported increased back pain down both legs and increasing left leg numbness after a fall ten days earlier.  AR 437.  Dr. Ward

again noted decreased sensation over the left lower leg and decreased reflexes, and some mild weakness with dorsiflexion.  AR 438.

In March 2009, a follow-up MRI showed no significant changes. AR 424.  Ms. Russell reported the pain had improved some but that her activities were still quite limited due to pain.  AR 424.  In April 2009, Ms. Russell complained of continuing radicular pain in her left leg and trouble sleeping because of the ongoing pain.  AR 421.  Dr. Ward noted the injections were not helpful and advised Ms. Russell was not a surgical candidate.  AR 422.

On May 20, 2009, Dr. Allen G. Brooks examined Ms. Russell for a disability evaluation.  AR 576.  Dr. Brooks diagnosed chronic L5 radiculitis with degenerative disease of the lumbar spine.  AR 578. As far as what Ms. Russell could or could not do in terms of work, Dr. Brooks declined to opine because a formal physical capacities evaluation would be necessary.  AR 578.  He did note that the examination did not show any evidence of functional overlay.  AR 578.

In September 2009, Ms. Russell sought emergency treatment for incapacitating leg pain.  AR 593.  On September 29, 2009, Dr. Roberson examined Ms. Russell and noted increased left L4 dermatome and "even more numbness in the left L5 dermatome."  AR 594.  He diagnosed an acute, large L4-5 recurrent herniated disc. AR 594.  Dr. Roberson performed a left L4-5 microdiscectomy.  AR

591.  He found a moderate amount of epidural fibrosis at the site of her previous laminotomy, and a large L4-5 herniated disc.  AR 591.

On October 1, 2009, Ms. Russell was discharged from the hospital.  AR 585.  She returned two days later, however, in severe pain and barely able to walk.  AR 598.  An MRI revealed a large mass at L4-5.  AR 598.  Dr. Roberson again operated, removing gel foam inserted in the September 29, 2009, surgery that was compressing the thecal sac and left L5 nerve root.  AR 596-97.  Ms. Russell was discharged the next day and initially did well.  AR 606.

By October 26, 2009, Ms. Russell again reported markedly increased pain in her low back and left leg.  AR 606.  An MRI revealed a possible recurrent L4-5 disc extrusion.  AR 607.  On November 2, 2009, Dr. Roberson performed another left L4-5 microdiscectomy.  AR 611.  He again found a large acute recurrent herniated disc underneath the thecal sac and left L5 nerve root.  AR 611.  He noted epidural adhesions and a very large annular hole at L4-5.  AR 611.

At the end of November 2009, Ms. Russell developed severe left leg pain that was tolerable only if she would lie still and take pain medications.  AR 668.  On November 30, 2009, Dr. Roberson performed a lumbar fusion.  AR 619.  This was necessary because of the likelihood of further recurrence of herniation due

to a very large swollen annulus created by the large herniation in September. AR 619. During surgery, Dr. Roberson did not find a recurrent herniation, but there was granulation tissue and epidural fibrosis forming in the left lateral gutter and around the left L5 nerve root. AR 619. Dr. Roberson noted Ms. Russell had had an L4-5 left dorsiflexion weakness for several months, and that finding remained unchanged. AR 620.

Two weeks post-surgery, on December 17, 2009, Ms. Russell still reported back and leg pain, but it was much better than pre-surgery or immediately post-surgery. AR 667. Dr. Roberson thought her residual left leg pain was totally understandable, and noted her left dorsiflexion improved to close to normal. AR 667.

Two months post-surgery, on January 26, 2010, Ms. Russell reported continual improvement, with very little low back pain but some residual left leg pain. AR 666. Dr. Roberson noted she was doing well, but he was not totally comfortable because she still had radicular pain. AR 666.

On March 31, 2010, Ms. Russell still had left leg "aching type" discomfort if she walked a good distance, and sometimes when she sat, but it was not severe. AR 665. She had some mild low back pain. AR 665. Dr. Roberson doubted she had ongoing compression of her left L5 nerve root, but it was conceivably secondary to the epidural scar formation noted in the last surgery. AR 665. Another possible explanation was mild residual

from the intermittent severe compression she experienced over a period of months prior to the November 30, 2009, surgery.  AR 665.

On August 20, 2010, Ms. Russell saw Dr. Ward, and reported more significant back pain.  AR 738.  Dr. Ward told Ms. Russell there was still hope for improvement, but it might be very slow and take a long period of time.  AR 738.  Ms. Russell continued with medications of hydrocodone and oxycodone to manage pain.  AR 738.

On October 29, 2010, Dr. Ward noted decreased sensation to light touch over the left lateral thigh and lower leg.  AR 734.  Ms. Russell was continuing to take hydrocodone consistently, and was also using oxycodone for breakthrough pain.  AR 733.  Dr. Ward diagnosed lumbar radiculopathy, left.  AR 734.

In March 2011, Dr. Roberson reviewed a January MRI and stated that it was possible there was a small disc protrusion, and that both Ms. Russell's symptoms and her examination supported a new lumbar radiculopathy.  AR 772.  He advised trying some non-operative approaches such as physical therapy before considering another surgery, and if necessary, nerve root blocks.  AR 772.

On April 13, 2011, Dr. Maria Armstrong-Murphy, an internal medicine and physical medicine and rehabilitation specialist, examined Ms. Russell at the request of the agency.  AR  773-783.  Dr. Armstrong-Murphy noted that Ms. Russell had a very antalgic gait and a very poor heel strike on the left, positive straight

leg on the left, and decreased sensation with absent ankle jerk.
AR 774.   Dr. Armstrong-Murphy diagnosed chronic back pain with
radicular symptoms, status post failed surgical attempt times
four, with a lumbar fusion, and L5 radiculopathy.  AR 775.  She
opined that most likely Ms. Russell's pain was from posttraumatic
degenerative disc disease and facet joint arthropathy.  AR 775.
She wrote that Ms. Russell should perform no excessive stooping,
bending, or lifting, and could sit for one hour with breaks up to
six hours in a day.  AR 775.  Ms. Russell could lift and carry 20
pounds occasionally and 10 pounds frequently, stand and walk up to
15 minutes at a time with breaks as needed, and stand and walk for
three hours in a day.  AR 775.

### B.   Relevant Mental Health Evidence

Dr. Ward diagnosed Ms. Russell with acute situational
Depression on April 11, 2005.  AR 494.  Ms. Russell had been
taking lexapro, and Dr. Ward switched her medication to effexor.
AR 494.

In a follow-up visit on May 31, 2005, Ms. Russell reported
she was doing well on effexor.  AR 491.  Dr. Ward recommended she
continue on the medication for three months.  AR. 491.  On
September 27, 2005, Ms. Russell reported continuing poor
motivation, fatigue, and withdrawing. AR 486.  Dr. Ward diagnosed
Ms. Russell with depression, continued Ms. Russell's effexor
prescription, and added paxil.  AR 487.  On October 27, 2005, Ms.

Russell reported she was getting a little better, but felt there was still room for improvement. AR 483. Ms. Russell continued with the effexor and increased the paxil dose. AR 484. Dr. Ward continued to treat Ms. Russell for Depression throughout the remainder of 2005, and his treatment, including prescription medications, continues throughout the entire duration of the medical records. In addition, although no treatment notes or other documents appear in the record, Ms. Russell reported treatment at the Linn County Mental Health Clinic "off and on" from the end of 2005, through December 2008. AR 389.

On December 5, 2008, Gale Smolen, M.D., a psychiatrist, examined Ms. Russell at the agency's request. AR 388. Ms. Russell reported extreme mood swings, depression, and low energy. AR 389-90. She reported "good days and bad," and that some days "she feels a complete mess" and "some days she feels clear-headed." AR 390. Dr. Smolen diagnosed Ms. Russell with bipolar II disorder and anxiety Disorder NOS. AR 390. She opined that Ms. Russell is able to remember and understand with moderate impairment, primarily because of anxiety. AR 391. She thought Ms. Russell could concentrate and attend and that she would be able to get along well with people, were it not for the fact that she has severe back pain. AR 391.

On December 30, 2008, Bill Hennings, Ph.D., submitted a psychological assessment on behalf of the agency. AR 394-407.

Dr. Hennings did not examine Ms. Russell, but upon review of the record he opined she has multiple mental impairments, depression, bipolar disorder, and anxiety disorder. AR 406. He opined that the impairments cause no more than mild impairments in activities of daily living, social functioning, and concentration, persistence, or pace. AR 406.

On May 4, 2009, Dorothy Anderson, Ph.D., submitted a mental summary on behalf of the agency. AR 575. Dr. Anderson did not examine Ms. Russell, but upon a review of the record she opined that Ms. Russell's mental impairments are non-severe. AR 575.

On January 20, 2011, Leia Hughey, Ph.D., a licensed psychologist examined Ms. Russell at the agency's request. AR 741. Ms. Russell undertook a Personality and Assessment Inventory, and obtained a valid profile and did not attempt to present herself in a more positive or negative light than warranted. AR 742. Her profile suggested significant distress centered on her physical functioning and seeing her life as severely disrupted by physical problems. AR 742. She reported difficulties consistent with a significant depressive experience. AR 742. The test revealed a high degree of somatic concerns and a ruminative preoccupation with physical functioning, likely chronic, and accompanied by fatigue and weakness that rendered her incapable of performing even minimal role expectations. AR 742. Ms. Russell indicated being moody and emotionally labile, with

thought processes marked with confusion and difficulty concentrating. AR 742. Ms. Russell's immediate memory and her attention was in the borderline range. AR 742.

A screening for malingering or symptom magnification was in the normal range, supporting the validity of the evaluation. AR 744. Dr. Hughey opined:

> [Ms. Russell's] poor physical health may have (unconscious) secondary gain aspects by providing her with justification to avoid situations that require engagement with other people. Nevertheless, her physical illnesses are by no means feigned. They simply present an opportunity for social avoidance.

AR 744.

Dr. Hughey diagnosed somatization disorder; rule out avoidant personality disorder, assigning a GAF of 54. AR 744. Dr. Hughey also completed a Mental Residual Function Capacity Report. AR 745-46. She indicated, among other things, that Ms. Russell was "moderately to markedly" limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. AR 746. She wrote that Ms. Russell was "markedly" limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR 746. She also wrote that Ms. Russell was up to

16 - OPINION AND ORDER -

moderately limited in her ability to work in coordination with or in proximity to others without being distracted by them and moderately limited in her ability to accept instructions and respond appropriately to criticism from superiors. AR 746. Dr. Hughey did not review Ms. Russell's medical records. AR 746. She opined that Ms. Russell was more impaired by pain and medication than by psychological symptoms, per se. AR 746.

On January 21, 2011, Dr. Ward wrote a letter describing Ms. Russell's ongoing physical and mental limitations. AR 748. Dr. Ward stated Ms. Russell continued to have symptoms of chronic low back pain with radicular symptoms into her left leg. AR 748. She also had continuing psychological symptoms of depression:

> At this point, Ms. Russell was quite limited in her function. I think these limitations would adversely affect her ability to function in a work setting. I think due to the chronic pain issues and depression, it would be difficult for her to work with the public, also interact with coworkers and supervisors in a normal work situation. I think she would be able to do some limited activities, however, it is my opinion that she would not be able to sustain activity even if it is sedentary due to her current health conditions.
>
> In her current status, I do not feel that Ms. Russell could consistently work in a simple, routine, low stress job. I think the greatest limitation would be to be able to do this at work without excessive absences. I think the combination of the chronic pain issues along with the depressive symptoms would limit her ability to be at work consistently. I believe she would need to miss more than 2 days per month of work.

AR 748.

C.    **Testimony at ALJ Hearing**

1.    **Ms. Russell's Testimony**

Ms. Russell testified she did not feel she could work because of pain. AR 58. She had good days and bad days, but on a bad day she cannot walk around very much and would miss more work than she would be able to work. AR 58. She could walk about a block before needing to rest. AR 59-60. She cannot easily lift a grocery bag with two gallons of milk in it without pain in her lower back. AR 60. She has to adjust her sitting position every couple of minutes because the nerve in her left leg starts to become very painful. AR 60. She will lie down on her side, from 15 to 20 minutes, or as long as a couple of hours, multiple times during the day. AR 63-64, 70-71.

Ms. Russell testified that on a good day, the pain is tolerable such that she can try and put it out of her mind, but on a bad day she cannot necessarily get her mind to think of other things. AR 69. Maybe two days out of seven are good days. AR 69. The pain affects her interaction with her family and friends because her mood changes, and she avoids interaction at those times. AR 70. She sometimes misses her children's school activities, because she is in too much pain. AR 70.

Ms. Russell testified that she had developed a lot of anxiety with public interactions and is full of anxiety being around new

people.  AR 71.  Her medication makes her sleepy and a bit drowsy, and contributes to her lack of concentration.  AR  72-73.

### 2.  VE's Testimony

The ALJ asked the VE to consider a hypothetical person who is limited to light work, but can occasionally lift 20 pounds and frequently 10 pounds, can stand and/or work six hours and sit for six hours in an eight hour day, and can occasionally perform all postural movements except balance.  AR 74.  The VE testified that such a person could not perform Ms. Russell's past work, but that alternative jobs would be meter reader, security guard, or small products assembler.  AR 75.

The ALJ then asked the VE to consider that the hypothetical person was further restricted to stand and walk four out of eight hours, requiring a sit/stand option with no climbing, crawling, or balancing, and only occasional stooping, bending, kneeling, or crouching.  AR 75-76.  The VE testified that the meter reader would still be in the hypothetical, but the limitation would reduce the security guard numbers by two-thirds and would not affect the assembly job.  AR  76.  All the jobs identified by the VE could be performed with only occasional public contact.  AR 76.

The VE also testified that if the person was absent from work two days per month, she would be unemployable.  AR 76.  Also, if the person were unavailable ten percent or more of the time,

either not at work or if she had to lie down, she would be unemployable.  AR 76-77.

The VE testified that the jobs identified did not, in a competitive setting, permit the employee to lie down outside of normal break time.  AR 77.  If the person had a marked (unable to persist when it occurs occasionally) limitation on her ability to maintain attention and concentration even for simple, routine tasks, and this were to occur on an occasional basis such that the ability to persist for simple, routine tasks would be interrupted, then all jobs would be precluded.  AR 77-78.

## III. The Sequential Analysis

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[ .]"  42 U.S.C. § 423(d)(1)(A).  "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011); *see also* 20 C.F.R. § 404.1520 (DIB); 20 C.F.R. § 416.920 (SSI); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  Each step is potentially dispositive.  20 C.F.R. §§

404.1520(a)(4); 416.920(a)(4).  The five-step sequential process

asks the following series of questions:

> 1. Is the claimant performing "substantial gainful
> activity?"    20  C.F.R.  §§  404.1520(a)(4)(I);
> 416.920(a)(4)(I).   This activity is work involving
> significant mental or physical duties done or intended
> to be done for pay or profit.  20 C.F.R. §§ 404.1510;
> 416.910.  If the claimant is performing such work, she
> is not disabled within the meaning of the Act.   20
> C.F.R. §§ 404.1520(a)(4)(I); 416.920(a)(4)(I).  If the
> claimant is not performing substantial gainful activity,
> the analysis proceeds to step two.

> 2. Is the claimant's impairment "severe" under the
> Commissioner's   regulations?     20   C.F.R.   §§
> 404.1520(a)(4)(ii); 416.920(a)(4)(ii). Unless expected
> to result in death, an impairment is "severe" if it
> significantly limits the claimant's physical or mental
> ability to do basic work activities.   20 C.F.R. §§
> 404.1521(a); 416.921(a).   This impairment must have
> lasted or must be expected to last for a continuous
> period of at least 12 months.  20 C.F.R. §§ 404.1509;
> 416.909.   If the claimant does not have a severe
> impairment,  the  analysis  ends.    20  C.F.R.  §§
> 404.1520(a)(4)(ii); 416.920(a)(4)(ii).  If the claimant
> has a severe impairment, the analysis proceeds to step
> three.

> 3. Does the claimant's severe impairment "meet or equal"
> one or more of the impairments listed in 20 C.F.R. Part
> 404, Subpart P, Appendix 1?  If so, then the claimant is
> disabled.    20   C.F.R.   §§   404.1520(a)(4)(iii);
> 416.920(a)(4)(iii).  If the impairment does not meet or
> equal one or more of the listed impairments, the
> analysis proceeds beyond step three.  At that point, the
> ALJ must evaluate medical and other relevant evidence to
> assess and determine the claimant's "residual functional
> capacity"  ("RFC").    This  is  an  assessment  of
> work-related activities that the claimant may still
> perform on a regular and continuing basis, despite any
> limitations imposed by his or her impairments.  20
> C.F.R. §§ 404.1520(e); 404.1545(b)-(c); 416.920(e);
> 416.945(b)-(c). After the ALJ determines the claimant's
> RFC, the analysis proceeds to step four.

> 4.  Can the claimant perform his or her past relevant
> work" with this RFC assessment?  If so, then the
> claimant is not disabled.  20 C.F.R. §§
> 404.1520(a)(4)(iv); 416.920(a)(4)(iv).  If the claimant
> cannot perform his or her past relevant work, the
> analysis proceeds to step five.
> 5.  Considering the claimant's RFC and age, education,
> and work experience, is the claimant able to make an
> adjustment to other work that exists in significant
> numbers in the national economy?  If so, then the
> claimant is not disabled.  20 C.F.R. §§
> 404.1520(a)(4)(v);   416.920(a)(4)(v);   404.1560(c);
> 416.960(c).  If the claimant cannot perform such work,
> he or she is disabled.  *Id.*

*See also Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four.  *Id.* at 953; *see also Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); *Yuckert*, 482 U.S. at 140–41.  The Commissioner bears the burden of proof at step five.  *Tackett*, 180 F.3d at 1100.  At step five, the Commissioner must show that the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience."  *Id.*; *see also* 20 C.F.R. §§ 404.1566; 416.966 (describing "work which exists in the national economy").  If the Commissioner fails to meet this burden, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v).  If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the

claimant is not disabled. *Bustamante*, 262 F.3d at 953-54;
*Tackett*, 180 F.3d at 1099.

## IV. The ALJ's Decision

The ALJ began his analysis by noting that Ms. Russell met the
insured status requirements of the Social Security Act through
June 30, 2007. AR 10. The ALJ then applied the sequential
analysis. At step one, the ALJ determined Ms. Russell had not
engaged in substantial gainful activity since January 6, 2005. AR
12. At step two, the ALJ found Ms. Russell had the following
severe impairments: lumbar spine degenerative disc disease status
post two discectomies and lumbar fusion, obesity, and chronic back
pain. AR 12. At step three, the ALJ determined that Ms. Russell
did not have an impairment or combination of impairments that met
or medically equaled a listed impairment. AR 15.

The ALJ then determined that, considering all of Ms.
Russell's impairments, both severe and non-severe, Ms. Russell had
the RFC to perform light work subject to certain physical
restrictions. AR 15. The ALJ found Ms. Russell can stand and
walk a total of four hours during an eight-hour workday, and she
can sit without limitation except she would benefit from a sit-
stand option, and she can occasionally stoop, bend, kneel, and
crouch, but cannot climb, crawl, or balance. AR 15. The ALJ
found Ms. Russell is unable to perform any past relevant work. AR

20.  However, based on vocational expert ("VE") testimony, the ALJ found Ms. Russell could perform other jobs existing in significant numbers in the national economy.  AR 21-22.  Therefore, at step five the ALJ found Ms. Russell was not disabled.  AR 22.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence.  42 U.S.C. § 405(g); *see also Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989).  "Substantial evidence" means "more than a mere scintilla but less than a preponderance." *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quoting *Andrews*, 53 F.3d at 1039).

Where the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading of the record, and this Court may not substitute its judgment for that of the Commissioner. *See Batson v. Comm'r*, 359 F.3d 1190, 1193 (9th Cir. 2004).  "[A] reviewing court must consider the entire record as a

whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (internal quotations omitted)).   A reviewing court, however, may not affirm the Commissioner on a ground upon which the Commissioner did not rely.   *Id.; see also Bray*, 554 F.3d at 1226.

## DISCUSSION

Ms. Russell seeks review of the ALJ's determination that she is not disabled.  She argues the ALJ erred in four respects:  (1) he failed to give clear and convincing reasons for rejecting Ms. Russell's testimony; (2) he erred in failing to give clear and convincing reasons for rejecting the opinions of Dr. Ward, the treating physician, and Dr. Hughey, the examining psychologist; (3)he erred in failing to include Ms. Russell's mental impairment as a "severe" impairment at steps two and four of the sequential analysis; and (4) the Commissioner did not meet her burden of proving Ms. Russell retains the ability to perform "other work" in the national economy.

## I.   Ms. Russell's Testimony

Ms. Russell argues the ALJ improperly rejected her testimony. The Ninth Circuit has developed a two-step process for evaluating the credibility of a claimant's own testimony about the severity

and limiting effect of the claimant's symptoms. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). The claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, "if the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; [the ALJ] must state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's

testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995)
(citing *Bunnell*, 947 F.2d at 345-46).

The ALJ may consider objective medical evidence and the
claimant's treatment history, as well as the claimant's daily
activities, work record, and observations of physicians and third
parties with personal knowledge of the claimant's functional
limitations. *Smolen*, 80 F.3d at 1284. The Commissioner
recommends assessing the claimant's daily activities; the
location, duration, frequency, and intensity of the individual's
pain or other symptoms; factors that precipitate and aggravate the
symptoms; the type, dosage, effectiveness, and side effects of any
medication the individual takes or has taken to alleviate pain or
other symptoms; treatment, other than medication, the individual
receives or has received for relief of pain or other symptoms; and
any measures other than treatment the individual uses or has used
to relieve pain or other symptoms. See SSR 96-7p, available at
1996 WL 374186.

Further, the Ninth Circuit has said that an ALJ also "may
consider . . . ordinary techniques of credibility evaluation, such
as the claimant's reputation for lying, prior inconsistent
statements concerning the symptoms, . . . other testimony by the
claimant that appears less than candid [and] unexplained or
inadequately explained failure to seek treatment or to follow a
prescribed course of treatment." *Smolen*, 80 F.3d at 1284. The

ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

The ALJ first stated that four months after Ms. Russell's final fusion surgery she had pain in her leg only after walking "a good distance" and had only mild low back pain when sitting. AR 16. He stated that the fact Dr. Roberson did not schedule any follow-up appointments was persuasive evidence that Ms. Russell's physical impairments are not disabling. AR 16. However, within a few months Ms. Russell's pain again worsened. AR 738. In October 2010, Dr. Ward noticed decreased sensation in the leg and diagnosed radiculopathy. AR 733. When Ms. Russell's pain continued to worse, Dr. Ward referred Ms. Russell back to Dr. Roberson, who diagnosed a new lumbar radiculopathy. AR 772.

The ALJ also stated that Ms. Russell's treatment, "other than the surgeries," has been essentially routine and conservative in nature." AR 16. He states that the majority of her surgeries occurred during a three-month period in 2009, and that any physical limitations during recuperation did not meet the one-year durational requirement. AR 16-17. The ALJ did not appear to take into account the degree of pain that Ms. Russell experienced before her surgeries, or the fact that Ms. Russell continues to

have radiculopathy following five lumbar surgeries.  Ms. Russell's care does not appear either routine or conservative in nature.

The ALJ also states that Dr. Ward worked with Ms. Russell to formulate a medication regime and that she indicated improvement on several occasions.  AR 17.  Indeed, Ms. Russell did show improvement at times, but her condition, both the back pain and the depression, require constant ongoing management and treatment. Moreover, as Ms. Russell testified, although she has managed the pain with narcotic medications, they make her drowsy and contribute to a lack of concentration.

The ALJ states that Ms. Russell's daily activities were inconsistent with her allegations of disability.  AR 17.  He noted that she was a single mother, helped her children get ready for school and with their homework, drove them to school, and performed household chores.  AR 17-18.  The ALJ also found the claimant had taken on additional daily responsibilities in the past year because she took custody of an ex-boyfriend's 13-year old daughter in September 2010, and planned to adopt the child, which the ALJ stated undermined Ms. Russell's allegations of disability.  AR 18.

Ms. Russell's children, including the foster child, are teenagers who fix their own breakfast and help with chores.  AR 62-63.  Ms. Russell's mother also helps her with the children.  AR 61.  The ALJ failed to address Ms. Russell's statements that she

manages her pain by lying down frequently throughout the day, sometimes for a few minutes, other times for several hours. The ALJ also failed to note that the custody situation with the foster child was not new, but in fact was the formalization of a living situation that had existed for some time.

The relevant medical records, Ms. Russell's testimony, and written statements from Ms. Russell evidence that she has serious difficulty with her lower back and left leg. There is ample objective medical evidence in the record to support Ms. Russell's symptom testimony. The AlJ failed to provide specific, clear, and convincing reasons for discrediting Ms. Russell's testimony. *Vasquez*, 572 F.3d at 591.

## II. Opinions of the Treating Physician and Examining Psychologist

Ms. Russell argues the ALJ improperly rejected the opinions of her treating physician, Dr. Ward, and the examining psychologist, Dr. Hughey. In considering medical evidence, the Commissioner should give more weight to a treating physician's opinion than to an examining physician's, and more weight to an examining physician's opinion than a reviewing physician's. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). "To reject [the] uncontroverted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Commissioner*, 528

F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).  If a treating

or examining doctor's opinion is contradicted by another doctor's

opinion in the record, the ALJ may reject it with "specific and

legitimate reasons that are supported by substantial evidence."

*Id*.  Additionally, "the ALJ must give appropriate weight to the

subjective aspects of the doctor's opinion."  *Rodriguez v. Bowen*,

876 F.2d 759, 762 (9th Cir. 1989).

### A.  Dr. Ward

In a January 31, 2011, letter, Dr. Ward summarized his

treatment of Ms. Russell, past and current:

> Ms. Russell has been seen in my practice since July 23,
> 2004.  At this point, I have been seeing her on a
> regular basis, usually monthly.  Most recently, we have
> been dealing with chronic pain issues related to her
> lumbar radiculopathy, also chronic depression issues. .
> . .
>
> Currently she continues to have symptoms of chronic low
> back pain with radicular symptoms into her left leg.
> Most recently these symptoms seem to have become more
> intense.  In addition, she also has psychological
> symptoms of depression.

AR 748.  Dr. Ward then opined as to Ms. Russell's ability to

function in a work setting:

> At this point, Ms. Russell is quite limited in her
> function.  I think these limitations would adversely
> affect her ability to function in a work setting.  I
> think due to the chronic pain issues and depression, it
> would be difficult for her to work with the public, also
> interact with coworkers and supervisors in a normal work
> situation.  I think she would be able to some limited
> activities, however it is my opinion that she would not

> be able to sustain activity even if it is sedentary due
> to her current health conditions.
>
> In her current status, I do not feel that Ms.
> Russell could consistently work in a simple routine, low
> stress job.  I think her greatest limitation would be to
> be able to do this at work without excessive absences.
> I think the combination of the chronic pain issues along
> with the depressive symptoms would limit her ability to
> be at work consistently.  I believe she would need to
> miss more than 2 days per month of work.

AR 748.

The ALJ gave "limited weight" to Dr. Ward's opinion.  AR 20.
The ALJ found that Dr. Ward's opinion was "inconsistent with the
opinions of multiple examining and reviewing physicians" and that
"[h]is treating notes, while cataloging the claimant's subjective
complaints, do not contain objective evidence that supports the
level of limitation that he proposes."  AR 19-20.  The ALJ also
found that Dr. Ward's prescriptions for two antidepressants and
three pain medications in January 2011 "when viewed in light of
the longitudinal record, is not persuasive evidence that the
claimant is incapable of performing full-time work activity
consistent with" the RFC determined by the ALJ.  AR 20.

Ms. Russell was examined by six non-treating doctors, purely
for disability assessment purposes, during the relevant period.
The four doctors who examined her in 2005 disagreed with each
other as to diagnoses and treatment plans.  AR 278, 317-18, 288-
89, 291.  In 2008, Dr. Vancura examined Ms. Russell for 30 minutes
and diagnosed a failed back syndrome with radiculopathy, but

stated she could nevertheless stand and walk for four hours, had no limitations in sitting, and could lift ten pounds occasionally and 20 pounds frequently.  AR 387.

Dr. Armstrong-Murphy was the only non-treating physician to examine Ms. Russell after her five failed surgeries.  AR 773.  She diagnosed Ms. Russell with "chronic axial low back pain with radicular symptoms, status post failed surgical attempt times 4, with lumbar fusion, and L5 radiculopathy."  AR 775.  Moreover, Dr. Armstrong-Murphy stated, "[m]ost likely Ms. Russell suffers from post-traumatic degenerative disc disease and facet joint arthropathy explaining her persistent axial pain."  AR 775. Nevertheless, Dr. Armstrong-Murphy opined that Ms. Russell could sit for one hour with breaks, up to three hours, and lift and carry ten pounds frequently and 20 pounds occasionally.  AR 775.

Both Drs. Vancura and Armstrong-Murphy had limited contact with Ms. Russell.  While Dr. Vancura did review at least some of Ms. Russell's medical records, Dr. Armstrong-Murphy does not mention any such review.  AR 383, 774-75.  Notably, Dr. Armstrong-Murphy does not indicate she reviewed the most recent MRI performed prior to her examination which showed a possible disc protrusion, or Dr. Roberson's finding that there was a "new radiculopathy."  AR 772.

The ALJ also stated that Dr. Ward's notes do not contain objective evidence supporting the level of limitation he proposed.

AR 19-20.  However, Dr. Ward frequently noted decreased sensation and reflexes in Ms. Russell's lower left leg, consistent with radiculopathy and disc herniation.  AR 437, 456, 460, 773, 750. He observed her throughout the entire relevant period, continually adjusting her psychotropic and pain medications.  Dr. Ward's opinion is consistent with Ms. Russell's continued radiculopathy, despite five lumbar surgeries.

The ALJ's reasons for rejecting Dr. Ward's opinion are neither "clear and convincing" nor "specific and legitimate."  Dr. Ward's opinion is well-supported by his records over the relevant period as well as by the records of Dr. Roberson, and the other specialists to whom Dr. Ward referred Ms. Russell.  Accordingly, the ALJ erred in failing to fully credit Dr. Ward's opinion.

**B.  Dr. Hughey**

The ALJ noted that Dr. Hughey "believes the diagnosed impairments cause anywhere from no significant to marked limitations in specific abilities related to performing full-time work activity."  AF 14.  However, the ALJ found this opinion statement "not especially helpful in determining the [Ms. Russell's] mental residual functional capacity" because she concluded her opinion statement by saying Ms. Russell "is more impaired by pain [and] medication than by psychological symptoms per se."  AR 14.  That concluding sentence lead the ALJ to find

Ms. Russell's mental symptoms, standing alone, are not severe.  AR 14.

Dr. Hughey's opinion shows Ms. Russell has significant impairment in her ability to maintain attention and concentration for extended periods and is markedly limited in her ability to sustain a normal workweek and workday without psychologically-based symptoms.  AR 756.  The VE testified that a marked limitation in attention and concentration, such as that noted by Dr. Hughey, would preclude all work.  AR 77-78.  If the person's symptoms interrupted the work, even as much as ten percent of the time, she would be unemployable.  AR 76-77.

The Commissioner argues the ALJ properly found Ms. Russell's mental conditions did not significantly affect her ability to do basic work activities because Dr. Hughey stated that Ms. Russell was more impaired by pain and medications than by psychological symptoms.  However, Dr. Hughey did not state she was basing her opinion statement on Ms. Russell's physical condition.  Indeed, she noted she performed her evaluation without the benefit of seeing Ms. Russell's medical records.  AR 746.  She believed, based on Ms. Russell's report to her, that Ms. Russell was *more* impaired by her back condition than by her psychological condition, but she nonetheless observed numerous signs of a severe mental condition, such as valid test results showing a high degree of somatic concerns, emotional lability, significant depressive

experiences, and thought processes marked with confusion and difficulty concentrating.  AR 743.  Accordingly, the ALJ erred in not taking due consideration of Dr. Hughey's opinion as to Ms. Russell's mental limitations.

### III. Exclusion of Mental Limitations at Steps Two and Four

Ms. Russell argues the ALJ erred in failing to include her mental condition as a "severe" impairment at steps two and four of the sequential analysis.  At step two, the claimant must present evidence of at least one impairment that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c) (defining "severe impairment"); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1988).  An impairment may be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  On review, the court must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that Ms. Russell did not have a medically severe impairment or combination of impairments. *Id.* at 687.

The severity of Ms. Russell's mental condition is established by Dr. Hughey's finding that she has moderate and marked limitations in her mental capacity. The ALJ erred in failing to

consider this finding.  Moreover, the limitations noted by Dr. Hughey are consistent with the longitudinal treatment Ms. Russell received for depression from Dr. Ward.

The ALJ gave significant weight to the opinions of two non-examining physicians who found Ms. Russell's depression "not severe," Bill Hennings, Ph.D., and Dorothy Anderson, Ph.D.  AR 14-15.  Contrary to the ALJ's conclusion, however, the opinions of these two non-examining physicians were not consistent with the longitudinal record of Ms. Russell's depression.

The ALJ's finding that Ms. Russell's mental limitations were not severe was not harmless, as argued by the Commissioner.  Had Dr. Hughey's identification of "marked" mental limitations been recognized as establishing depression as a severe impairment at step two, and subsequently in determining Ms. Russell's RFC, the VE testified such limitations would have precluded employment at all jobs.  AR 77-78.

## IV. Burden of Proving Ms. Russell Retains the Ability to Perform "Other Work" in the National Economy.

The ALJ found Ms. Russell no longer has the ability to perform her past relevant work.  As such, the burden shifted to the Commissioner to prove Ms. Russell is capable of working an eight-hour day at some alternate job within her RFC.  *Rodriguez v. Bowen*,   In order to meet that burden, the hypothetical posed to the VE by the ALJ must take into consideration all of the

claimant's limitations supported by the record. *Robbins*, 466 F.3d at 886.

Ms. Russell argues the VE's testimony did not allow the Commissioner to meet the burden of proving she has retains the ability to perform "other work" in the national economy. Given the court's finding that the ALJ was incorrect in failing to credit Ms. Russell's testimony, and Dr. Ward's and Dr. Hughey's opinions, and in failing to include Ms. Russell's depression as a severe impairment at step two, Ms. Russell is correct.

The VE testified that if the hypothetical person was absent from work two days per month, she would be unemployable. AR 76. If the hypothetical person were unavailable ten percent or more of the time, either not at work or if she had to lie down, she would be unemployable. AR 76-77. Finally, if the person had a marked limitation on her ability to maintain attention and concentration even for simple, routine tasks, and this were to occur on an occasional basis such that the ability to persist for simple, routine tasks would be interrupted, all jobs would be precluded. AR 77-78. Accordingly, at step five the Commissioner did not meet the burden of proving Ms. Russell retains the ability to perform other work in the national economy.

**V.    Remand for Benefits**

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000), *cert. denied*, 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r*, 635 F.3d 1135, 1138 (9th Cir. 2011) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004)). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id*. at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id*. (quoting *Benecke*, 379 F.3d at 593). The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court

flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (citing *Bunnell*, 947 F.2d at 348). The reviewing court should decline to credit testimony when "outstanding issues" remain. *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010) (citation and internal quotation marks omitted).

As explained above, the ALJ failed to provide legally sufficient reasons for rejecting Ms. Russell's symptom testimony, and for not giving credit to the opinions of Dr. Ward and Dr. Hughey. The ALJ also erred in failing to include Ms. Russell's depression as a severe impairment at steps two and four of the sequential analysis. Had the ALJ done so, Ms. Russell's RFC would have included limitations which, if they had been included in the hypothetical, the VE testified would preclude employment in any job in the national economy. AR 65. Based on this finding, the record shows that properly crediting Ms. Russell's testimony and the opinions of Drs. Ward and Hughey requires a finding of disability. The record in this case is fully developed and there are no outstanding issues to resolve.

## CONCLUSION

The Commissioner's decision that Ms. Russell is not disabled is REVERSED and this case is REMANDED for an award of benefits.

IT IS SO ORDERED.

DATED this 27th day of March, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge